Filed 11/19/20  In re Julia G. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JULIA G. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> EVA M. et al., <br><br> Defendants and Appellants. | F081094 <br><br> (Super. Ct. Nos. 13CEJ300329-1, 13CEJ300329-2, 13CEJ300329-3 & 13CEJ300329-4) <br><br> **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  William Terrence, Judge.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant Eva M.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant Justin M.

---

[*]     Before Poochigian, Acting P.J., Meehan, J. and De Santos, J.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

In this juvenile dependency case, Eva M. (mother) and Justin M. (father) (collectively, "the parents") appeal the juvenile court's order terminating their parental rights as to their four minor children (Welf. & Inst. Code, § 366.26).[1] Both parents contend the juvenile court erred by failing to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). Finding no error, we affirm.

## FACTUAL AND PRCEDURAL BACKGROUND

In December 2018, the Fresno County Department of Social Services (department) received a referral alleging general neglect of eight-year-old Julia G., six-year-old Justin G., three-year-old Jordan G., and 12-month-old Joseph G. (collectively, "the children") due to unsanitary living conditions and ongoing domestic violence between mother and father. Most recently, father had sent a threatening text message to mother and punched her in the face, causing mother to call the police. Father was arrested for violating an existing domestic violence protective order. Animal feces was observed throughout the home, there was minimal food, and the children were dirty. There were also concerns mother had been using methamphetamine. The investigating social worker noticed no visible signs of physical abuse on any of the children. Both Julia and Justin, however, reported to ongoing domestic violence taking place in the home in their presence. Jordan and Joseph were too young to make statements. The children were placed in protective custody.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2.

Mother admitted to domestic violence in the relationship and said that father was using drugs. She allowed him to care for the children while he was under the influence because she had no one else to rely on.

Mother was late to a team decision making meeting because she had used a mixture of methamphetamine and heroin the night before. It was decided at the meeting the children would remain in out-of-home care.

The department filed a petition on behalf of the children alleging they came within the jurisdiction of the juvenile court under section 300, subdivisions (b)(1) [failure to protect] and (c) [serious emotional damage] due to domestic violence, drug use, unsafe and unsanitary living conditions, and risk of suffering serious emotional damage due to domestic violence.

Father denied any domestic violence but admitted to using marijuana and methamphetamine and caring for the children while under the influence.

On December 20, 2018, the court ordered the children detained from the parents and set the matter for a combined jurisdiction and disposition hearing. The children were placed together in a foster home. Mother enrolled in random drug testing and tested positive for amphetamine, opiates, and creatinine on December 19, 2018. She tested negative for alcohol and controlled substances on December 26 and 31, 2018, and on January 4, 2019. Father did not register for random drug testing.

Amended petitions were filed, adding allegations that Jordan and Joseph came within the court's jurisdiction under section 300, subdivision (j) [abuse of siblings] due to a prior welfare case involving Julia and Justin. In 2013, Julia and Justin had been removed from the parents' custody due to substance abuse and domestic violence. The children were returned to the parents' custody in 2015 after the parents had completed family maintenance services, including substance abuse and domestic violence, and the case was dismissed.

The department's jurisdiction and disposition report indicated that after the parents' 2013 child welfare case was dismissed, mother tested positive for methamphetamine at the time she gave birth to Jordan. Joseph was born in 2017 and diagnosed with failure to thrive. From 2016 through October 2018, the department received multiple referrals related to the family's drug use, domestic violence, and general neglect. In December 2017, a three-year restraining order was issued by family court protecting mother and the children from father.

Because the parents were demonstrating ongoing issues for which they had received services in the past and had failed to ameliorate those issues, the department concluded removal was necessary. In addition, the department reported that both parents met the criteria for the bypass provisions of section 361.5, subdivision (b)(13) in that they had a history of extensive, abusive, and chronic use of drugs or alcohol, had resisted prior court-ordered treatment, and that it was not in the children's best interests for the parents to receive reunification services. The department reported that mother had been using drugs since 2010 and father had been using drugs since he was 13 years old. As part of the previous dependency case, mother and father had each completed a residential substance abuse program and participated in aftercare treatment. The department reported mother and father had passively resisted treatment as evidenced by mother's positive test and admission she used heroin and methamphetamine and father's admission he uses methamphetamine and marijuana.

Julia completed a mental health assessment in February 2019, and it was determined that she met medical criteria for mental health services. She began seeing a therapist weekly. Justin, Jordan, and Joseph were also assessed but were not determined to need services.

At the combined jurisdictional and dispositional hearing held on April 4, 2019, Julia testified she wanted to live with her parents. She testified father is "nice, and he takes us to the fun places a lot. And he buys us stuff, and I love him." She testified

4.

mother "is nice, and she is a good person, and she would take us to places too, like church. And I love her." Julia also testified the parents fought, and they yelled and hit each other. She said it made her sad, it was scary, and it happened a lot.

Justin testified he wanted to return home to the parents because he misses and loves them. Justin testified his parents fought; they yelled and "kind of" hit each other too. Justin said it did not feel good when it occurred in his presence. Justin testified where he lives right now is "good." His visits with the parents were good.

Father testified he and mother had a history of domestic violence but denied ever hitting mother. Father said he and mother yell at each other but there was "not much" actual physical violence and that it occurred years and years ago. Father testified it was his opinion that past services were not successful because he and mother were separated at the time. They had since "come back together" and were living together.

Mother testified father had never hit her and that there were different forms of domestic violence in the relationship, "not physical, really." She denied telling police father punched her and said she called the police because she had "had enough of fighting." Mother testified she and father were participating in couples therapy. Mother testified that during the previous dependency case, she and father were not allowed to attend couples counseling and attended services separately. Mother stated she and father "were not a team" during the previous dependency case, and she was "distracted" with what he was doing in his program. She and father were currently in a good place in their relationship.

The court found each allegation in the petition true and that the bypass provisions of section 361.5, subdivision (b)(13) applied. As to the issue of whether providing services was in the best interests of the children despite the applicable bypass provisions, the court stated it found Julia's and Justin's testimony about the violence in their household "very compelling" and noted that the parents' "denial seems to be alive and well when it comes to the issue of domestic violence in this case." For those reasons, as

well as the interest of stability and continuity of the children, the court found providing services was not in the best interests of the children "despite the testimony of the children who did say that they love their parents and that they want to go home with their parents." The court ordered the parents would not be provided with reunification services. The matter was set for a section 366.26 hearing, and the parents were ordered to have two supervised visits per month.

The visits went well, with the parents bringing food and activities. The children generally greeted their parents with hugs and kisses and no issues were noted at the end of visits. The children's faces were described as "light[ing] up with excitement and smiles" when they saw their parents.

The social worker reported that Julia often recollected memories of when she lived with her parents. Julia told the social worker she missed her parents and remembered when her parents taught her and her brothers to love each other. She said her parents fought a lot but they really loved each other. Justin became emotional when speaking about his parents to the social worker. Jordan was not displaying any behavioral problems and had age appropriate mental and emotional reactions. Joseph was noted as doing "exceptionally well" when separating from his birth parents and care provider. He was described as easily soothed and not displaying separation anxiety from either the parents or the care provider.

The children's paternal cousin, Stephanie D., came forward requesting placement of the children and expressed a desire to adopt them. The children and Stephanie met at a McDonald's in June 2019, and the visit went well with the children asking at the end of the visit when and if they would get to visit with her again.

In July 2019, both parents filed section 388 petitions requesting family maintenance services, alleging they had participated in voluntary services. The court set a hearing for the section 388 petitions for the same day the section 366.26 hearing was scheduled.

6.

In August 2019, the social worker spoke to Julia and Justin about the likelihood they would be adopted and that they potentially would change placements to live with Stephanie. Julia and Justin expressed concern about not being able to visit their parents. Julia told the social worker she felt like a child "sometimes only" because she had to protect her brothers and thinks a lot about her parents. Julia stated her parents are always on her mind. Julia was emotional about being adopted but said she would rather be with Stephanie than with strangers. Justin cried and said he wanted to live with his grandfather but was easily consoled.

Later that month, the children were placed with Stephanie, who lived out of county approximately three hours away. The children appeared to be happy and excited when they arrived at Stephanie's home. The children adjusted well and enjoyed their new schools.

At a visit the day after the children were placed with Stephanie, Julia and Justin told the parents, "They said we aren't going to see you[] both until we are adults." Justin became emotional. Julia then told the parents she is not so sad because she is with family and told them how much she likes her house. The rest of the visit went well. The parents' visits with the children continued to go generally well. The parents usually brought food, and the family ate and played together. The children were happy to see the parents.

By the time the social worker conducted a home visit in September, the children were beginning to call Stephanie "mommy." Jordan told Stephanie he wants to get into her belly so he can be her baby. When the social worker asked Julia, Justin, and Jordan if they liked living with Stephanie, the children's eyes "brightened up," and they stated they love living with her. They enjoy going to Stephanie's parent's home to ride bikes and play with the animals. The social worker asked the children how the visits with their parents were going, and Julia said, "I like them, but I don't like them." Julia said traveling to visits is exhausting and she wishes visits were just once per month. Julia told

the social worker that she is okay with being adopted by Stephanie and understands she cannot return home to her parents. Justin stated he only wants to be adopted by mother. Justin then became concerned about Joseph and stated he was too young to be adopted. The social worker was able to calm Justin down when she assured him they would all be adopted together.

When the social worker visited the children at home in October 2019, the children were excited and happy to share their progress in school. They were making friends and adjusting well to their routines. Julia was invited to a birthday party and reported no one had ever invited her to a birthday party before. Julia and Justin reported that they love living with Stephanie and report feeling safe with her. Julia told the social worker she wanted to get adopted, and Justin stated he did not want to get adopted. Justin then changed his statement and stated he would like to get adopted after Julia reassured him they would get to stay together and they can visit their parents when they are 19 or 21. The social worker observed that Joseph had developed a strong attachment to Stephanie. He insisted on being held by her and cried when she was out of his sight and referred to her as "mommy."

In October 2019, the court ordered visits be changed from two times per month for one hour to one time per month for two hours because of the travel time involved for the children for visits.

When the social worker visited the children at home in November 2019, the children continued to do well. Stephanie reported that Julia had told her she wants to be adopted. Julia introduced the care provider as, "This is my cousin, but also my mom."

Mother commissioned a bonding study to be conducted by clinical psychologist Richard Engeln, Ph.D., of the children and the parents. Engeln summarized his findings in a report. Engeln observed two visits between the parents and the children on December 14, 2019, and January 11, 2020. Engeln noted the parents did a "very admirable job" of working together, relating to the children with nurturance and

8.

direction.  Engeln noted the positive affect of the children and the parents as they related was "outstanding."  The children were positive and excited to see their parents and called them "Mommy" and "Daddy" frequently.

At the first visit Engeln observed, the parents gave the children pajamas as Christmas presents.  The children asked to put them on and wore them for the remainder of the visit and left with them.  Engeln noted this "appeared to reflect [a] wish to please their parents, and take a piece of them with them."  The children spoke about their experiences from their foster home placement and the parents encouraged them without defensiveness.  The visit ended with the children jumping on father while he lay on the floor and then laying on top of him while mother encouraged and changed Joseph's diaper.  There were hugs and statements about the next visit as they left.

At the second visit, Engeln noted the children were excited to see their parents and were affectionate.  Engeln wrote he was "impressed" with how the children behaved during the visits, which were two hours in length, the sensitivity of the two older children of the needs of the two younger children, and the developmental levels of the children.

Engeln had a short interview with Julia.  Julia identified her parents and siblings as a family.  Julia explained she was in a foster home because her parents were always fighting.  She described being happy and loving the foster home.  Julia stated she would be very upset if visits with her parents did not continue in the future.

Engeln concluded there was positive bonding of the parents with the children, and positive bonding of the children with the parents.  He wrote:  "Because of the high bonding demonstrated between Mother and the children, abrupt and lengthy separation and lack of contact will be problematic for the children in the future.  Children deal with these feelings of abandonment with depression, or with anger.  Children often demonstrate this by rebelliousness, or feelings of resentment toward 'the system,' or societal authorities."

When the social worker visited the children at home in January 2020, the children continued to do well. They were adjusting very well, and participating in activities after school, and responding well to Stephanie's parenting.

At the section 366.26 hearing held on February 11, 2020, Julia testified she loved her mom "a lot" and liked visiting with her. Julia testified she understood adoption to mean "that you don't go back with who you were and you live with them forever." Julia understood she would not get to go home to her mom, but she would like to. She would feel "very sad" if she did not get to see her mom anymore and would also be sad about not visiting her dad.

Justin testified his last visit with his parents went "amazing." He understood adoption to mean that he would stay with somebody else "for forever" and that he would not see his parents anymore. He would be "very sad" if he did not get to visit with his mom anymore and "[v]ery, very sad" if he would not visit with his dad anymore. Justin testified he did not want to be adopted.

Stephanie testified the children were doing well in school. Julia won a distinguished student award, and she and Justin have a lot of friends. They appear to be happy in her home. Stephanie said she interacts with the parents at pick up and drop off at visits and had one negative experience with father where he got upset when she said she was not willing to do legal guardianship. She was not willing to be a legal guardian because of the travel time involved for visits but would, as an example, be willing to take the children for visits once every three months. Stephanie did not have concerns about the relationship between her and the parents that would keep her from wanting to be the legal guardian "as long as they know boundaries and that I'm the one in charge of the children." She had not had any negative experiences with them regarding boundaries.

Engeln testified as an expert on parent-child bond. From the two visits Engeln observed, he viewed the relationship between the parents and the children to be "very positive." The children identify mother as "mommy" and the exchanges are nurturant

10.

and positive. The bonding appeared "very strong." He believes there is a benefit to the children's relationship with mother. He testified it would be detrimental to eliminate the relationship because the children see her as "mommy" and they need to have ongoing visitation contact. Engeln opined severing contact would result in some depressive features that could be expressed through rebellion in adolescence or through ongoing depression. Engeln also said this was not a certainty, and he could not opine on how these particular children would respond. The children could also end up idealizing the parents; this, however, could be discussed in counseling, and its effects perhaps could be minimized through counseling. Engeln also testified there is a positive, significant attachment between the children and father and that ongoing contact with father would be beneficial. The children "absolutely" benefit from the visits. The children would benefit from a continued relationship with their parents and it would be detrimental to terminate that relationship.

Out of the approximately 500 bonding studies Engeln has done, he finds children had a bond with the parent approximately 90 percent of the time. Engeln testified the relationship between mother and father is volatile, and it negatively affects the children a great deal. Engeln opined the parents need to make significant changes in lifestyle including living separately and being significantly involved in drug rehabilitation and support for abstinence from drug use. If the volatility were to continue, and the parents were not to make the changes necessary, the negativity would continue to affect the children. There would be detriment even if the children were not witnessing the fighting; the children would have an awareness if the parents were living together and violent with one another.

Mother testified she was not currently in a romantic relationship with father and that they decided to separate in May though there were times they lived together after May. Mother is planning to file for divorce. She had previously filed in 2013, but it was never finalized; since it had been so long, she was going to have to file new paperwork.

11.

Mother had returned to live with father after filing the paperwork previously, but did not currently intend to stay in a relationship with father. They were not currently living together. Mother testified she was working on her sobriety; she was attending meetings and was about two weeks away from completing an out-patient program. She was also participating in counseling and had discussed her substance abuse and history of being in a domestic violence relationship with her counselor. She had also completed a domestic violence program.

Father testified he and mother visit together because they thought it was best for the children. Engeln's testimony that mother and father were an intact couple was a misunderstanding. Father said he currently lived in a different town, but when he came to town for visits or court, he would sometimes stay with mother. When asked if he and mother were a couple, he responded, "A couple, as everyone in this room understands, no. But we do have children together and we'll always have to do—I think it's our responsibility to better ourselves for our children." He said, "[t]echnically," he and mother stopped living together in October or November. When asked if he intends to reconcile with mother, he responded, "I'll do whatever it takes to get my kids back." When pressed further, he responded, it was not his "intention at this time." He later said he cannot predict the future but reconciling with mother was not one of his goals. Father testified his relationship with mother is not toxic.

The adoptions social worker, Mia Lee, testified she is a social worker practitioner, with Bachelor's and Master's Degrees in social work. Lee has been trained to assess parent-child relationships, children's adoptability, and assess what is in the children's best interest. She has received training regarding trauma and issues regarding the emotional well-being of children who have been removed from their parents, and the trainings are ongoing.

Lee opined it would not be detrimental to terminate the parental rights of the parents. She testified the children are doing really well since being placed with Stephanie

and are thriving in their development. Julia no longer needs mental health services since being placed with Stephanie. Julia adjusted very well into the home, no longer bites her nails, and was enjoying her time being a child.

Lee testified to ensure the children have long-term stability, care, safety and love, the plan should be adoption. Lee testified that her recommendation was adoption despite Justin's testimony he did not want to be adopted and Julia's and Justin's testimony they would be sad if they were not to see their parents again. Lee stated that in most cases, children have some benefit to a relationship with their parents and that the department is not disputing there is a bonded relationship between the parents and the children. Lee explained that because of the children's ages, adoption would be the most permanent plan for them to remain together as a sibling group should any of them develop negative behaviors in the future. Lee also emphasized adoption was the best plan to minimize future changes, which was particularly important given that Julia and Justin had been removed from their parents' twice in a short time. Further, Julia and Justin worry about their parents and had not had the opportunity to be children in their care. Adoption would prevent future uncertainty.

Lee testified that if the children were to show symptoms of depression resulting from the severing of their relationship with their parents, the department would send a mental health referral, and they would be assessed by a clinician. Lee also testified Stephanie is considering postadoptive contact with the parents. When asked if her opinion regarding adoption is affective assuming postadoptive contact is not permitted, Lee responded that she believed the children's need for permanency outweighs the parent-child relationship. Lee testified the volatility of the parents' relationship contributes to her opinion. Lee gave an example of mother calling her after May 2019 and wanting her visits separate from father and calling back six days later to say she wants the visits together again.

Lee testified that when a plan of legal guardianship is ordered, parents can bring requests to modify the guardianship in court. Lee testified that for Julia and Justin there has been a lot of uncertainty with regard to adoption, and they have changed their answers about whether they want to be adopted. Lee testified that she has seen the two younger children run to Stephanie and call her mom and are very comfortable with her and her family. The parents' ability to bring requests to change orders on a frequent basis would affect the children because it would add uncertainty.

Lee testified the parental bond is more secure for Julia and Justin than it is for Jordan and Joseph. If Julia and Justin were to be placed in a different permanent plan than Jordan and Joseph, there would be detriment. Both Julia and Justin have expressed to Lee that no matter what they would like to remain together. If they were in the same home but with different plans, it could cause detriment because Julia and Justin would have visits with their parents and it would cause confusion for all four children and resentment for the two younger children.

Both counsel for the department and the children argued that adoption is the best permanent plan for the children. The parents argued that the beneficial parent-child relationship exception to termination of parental rights applied and requested the court order a permanent plan of legal guardianship.

The court denied the parents' section 388 petitions finding they had not shown a change of circumstances nor that the requests were in the best interests of the children.

The court continued the matter to February 25, 2020, for ruling on the section 366.26 hearing, noting the primary issue was whether the beneficial parent-child relationship exception to termination of parental rights applied.

In making its ruling, the court found the children were adoptable. As to whether the beneficial parent-child relationship exception to adoption applied, the court first found the parents had consistently and regularly visited the children. The court then turned to the issue of whether that visitation and contact has created a parent-child

14.

relationship and the benefit of maintaining that parent-child relationship outweighs the benefits of adoption. The court noted the issues in the present case were very similar to the issues the parents were dealing with in 2013 and 2014 regarding substance abuse and domestic violence, and these issues are continuing to have negative effects on the family.

The court found Julia's and Justin's testimony "compelling" and referenced their testimony regarding the violence in their home at the jurisdictional hearing as well as their testimony at the section 366.26 hearing. The court then noted: "This Court has to answer the question as to not just whether a bond exists between Julia and Justin and each of their parents, but does that bond and that relationship outweigh the benefits the children would receive if placed for adoption and a new permanent home was established." The court noted Engeln's testimony that the parents' relationship was volatile and that they need to make significant changes in their lifestyles. The court characterized the parents' history as "consistently unstable." The court opined the issues of substance abuse and domestic violence had not been appropriately addressed. The court concluded the evidence showed the children would not be greatly harmed if parental rights were terminated and the parent-child relationship did not outweigh the benefits of adoption. The court terminated the parents' parental rights and ordered adoption as the permanent plan for the children.

The parents appealed.

## DISCUSSION

Under section 366.26, the statutory preference is to terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (b)(1).) "The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and

permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption. (§ 366.26, subd. (c)(1).) There are statutory exceptions which " 'permit the court, in *exceptional circumstances* [citation], to choose an option other than … adoption.' " (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.) " '[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an *extraordinary case* that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621, italics added.)

The beneficial parent-child relationship exception is one of the statutory exceptions. Section 366.26, subdivision (c)(1)(B)(i) provides the court shall terminate parental rights unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to show termination of parental rights would be detrimental to the child because an exception applies. (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646.)

"[B]enefit from continuing the relationship," within the meaning of section 366.26, subdivision (c)(1)(B)(i) has been interpreted to mean "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) " ' "[F]requent and loving contact" is not sufficient' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643) as "[i]nteraction between natural parent and child will always confer some incidental benefit to the child" (*In re Autumn H.*, at p. 575).

16.

In evaluating the issue of whether the relationship outweighs the well-being the child would gain from being adopted, the court must balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Here, both parents contend the juvenile court erred when it failed to apply the exception. The parties agree on appeal that the parents maintained regular and consistent visits with the children throughout the dependency proceedings and that there was evidence of some positive parent-child interaction between the parents and the children. Thus, we focus our review on the juvenile court's conclusion that any benefit derived from continuing the parent-child relationship was not a compelling reason for determining termination would be detrimental to the children so as to overcome the statutory preference for adoption. We review this conclusion for abuse of discretion, and any factual findings that underlie it for substantial evidence. (See *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 647.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)[2] We find no error. We do not find the juvenile court was

---

[2]     Appellate courts have adopted differing standards of review for the beneficial parent-child relationship exception: substantial evidence (see, e.g., *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165); abuse of discretion (see, e.g., *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449); and, more recently, a "hybrid" standard, which reviews the juvenile court's factual findings (e.g., whether the parents regularly and consistently visited and whether a beneficial parent-child relationship existed) for substantial evidence, and a juvenile court's conclusion that the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption for abuse of discretion (see, e.g., *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 647).

unreasonable in determining this was not one of the "extraordinary" cases where this exception should have been applied.

We acknowledge the parents and children had generally positive visits, which is evidenced by the reports as well as Engeln's observations. Engeln testified the children would suffer some detriment if the relationship were to be severed. Engeln also testified, however, that the parents needed to make significant lifestyle changes, and that volatility in their relationship would negatively affect the children even if they were not directly exposed to it. Though father points out the parents had been participating in services, we do not find the court erred by finding the parents had not adequately addressed their substance abuse and domestic violence issues, given Engeln's assessment and the evidence on the record that the parents' issues with substance abuse and domestic violence had previously continued despite completing services in the past. Engeln also testified that the children participating in therapy could help with some of the possible negative effects of severing the parent-child relationship, and Lee testified the children would be referred to therapy if they displayed any negative effects. Engeln's testimony did not compel the court to find the children would be greatly harmed if parental rights were to be terminated.

We also acknowledge Julia and Justin both testified they would be very sad if they never saw their parents again. While under subdivision (h)(1) of section 366.26, the juvenile court must consider the wishes of the child during permanency planning proceedings, the court also must analyze the beneficial relationship exception within the

---

The issue is currently pending before the California Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839. We note there is not much practical difference between the different standards of review. Under any of these standards of review, the practical differences between them are slight because they all give broad deference to the juvenile court's judgment. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) We should interfere only if under all the evidence viewed most favorably in support of the juvenile court's action, it finds no judge could reasonably have made the order. (*Ibid.*) We note we find no error under any of them.

18.

context of the child's best interests.  (§ 366.26, subd. (h)(1); *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165.)  Even when a child loves his or her parents and desires continued contact with them, the court may nonetheless terminate parental rights if doing so is in the child's best interests.  (§ 366.26, subd. (h)(1); *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 955.)

Here, the children's counsel argued that despite Julia's and Justin's desire to be with their parents, it was not in the children's best interest based on the parents' instability in their lives and the stability they would have if adopted by Stephanie. Counsel noted guardianship would create more instability in their lives.  Further, the record contains evidence that despite the children's enjoyment of time with their parents, Julia and Justin both expressed worry for the parents, and Julia expressed she felt like she could not be a child when in their care; there were reports from visits of Julia noticing mother had not gotten a pedicure and asking her why and if she and father will stop fighting when they go back with them, Justin getting emotional and telling mother he always worries about her, and Justin getting concerned after seeing a mark on mother's face, which turned out to be paint.  For these reasons, we find no error in the court's conclusion that its order was in the children's best interests despite their stated desires.

Mother argues this case is like *In re Scott B.* (2010) 188 Cal.App.4th 452 and *In re Amber M.* (2002) 103 Cal.App.4th 681, an argument which father joins.  Both cases are distinguishable.

In *In re Scott B.*, the appellate court reversed an order terminating parental rights, holding the court should have applied the beneficial parent-child relationship exception. There, the child had special needs and consistently reported he wanted to live with his mother throughout the proceedings.  The child's court-appointed special advocate (CASA) opined maintaining visits with the mother was " 'very important.' "  (*In re Scott B.*, *supra*, 188 Cal.App.4th at p. 461.)  The CASA recommended that the mother's parental rights not be terminated because when the child found out he might get adopted,

he threatened to run away and his behavior regressed to growling, biting, and lying. (*Id.* at p. 462.) The child's behavior had stabilized, by his foster mother's estimation, with the support of the mother. (*Id.* at p. 465.) The child was 11 years old and had lived with his mother for nine years. (*Id.* at p. 471.) The child's CASA reported the child would suffer detriment if the relationship were to be severed. (*Ibid.*)

Similarly, in *In re Amber M.*, the appellate court reversed termination of parental rights, finding the juvenile court should have applied the exception, where a psychologist, therapists, and the CASA all concluded a beneficial parental relationship clearly outweighed the benefit of adoption; the two older children had a strong primary bond with their mother, and the younger child was strongly attached to her. (*In re Amber M.*, *supra*, 103 Cal.App.4th at pp. 690–691.)

Here, in contrast to *In re Scott B.*, all of the children were very happy with Stephanie and thriving. Jordan and Joseph were of young ages and especially attached to Stephanie. While we acknowledge Julia's and Justin's testimony and their expressed desire to continue visits with their parents, there was no evidence they exhibited any emotional or behavioral issues that resulted from not being in the parents' care. Julia even requested to reduce visits because of the travel time involved, which indicates she was comfortable with reduced contact. When visits were reduced from two times per month to once a month, there was no evidence the children had any adverse reaction to the reduction. The children were able to participate in school and social and family activities. There was no evidence that not being with the parents had any debilitating effect on their daily life or ability to participate in activities. In fact, Julia's mental health improved after being placed with Stephanie. There was no evidence the children had any difficulty separating from the parents after leaving visits.

Further, in *In re Amber B.*, the appellate court there found a "common theme running through the evidence" that the relationship outweighed the benefit of adoption. (*In re Amber M.*, *supra*, 103 Cal.App.4th at p. 690.) We do find a similar "common

20.

theme" in the evidence before us.  We do not dispute that the children love their parents, but this record does not demonstrate the type of parent-child relationship that would compel the juvenile court to have applied the beneficial parent-child relationship exception to termination of parental rights.  We find no abuse of discretion and, accordingly, no error.

## **DISPOSITION**

The juvenile court's order terminating parental rights is affirmed.